UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ADH COLLISION OF BOSTON, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No.: |
| WYNN RESORTS, LIMITED, WYNN MA, LLC, WYNN DESIGN & DEVELOPMENT, LLC | ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT AND JURY DEMAND

### Introduction

This action arises from the above-named defendants' (collectively "Wynn") intentional interference with ADH Collision of Boston, Inc.'s ("ADH Collision" and the "Plaintiff") advantageous business relations with its landlord, A&R Realty Trust and its trustee, Rocco Vigorito (collectively "Landlord"). ADH Collision is the tenant pursuant to a lease of property located at 36 Mystic Street, Everett, MA 02149 (the "Property" and the "Lease"). ADH Collision operates an auto body shop at the Property. The Property is located in close proximity to Wynn's almost-fully-developed casino resort in Everett, Massachusetts. The Lease grants ADH Collision certain enumerated rights to occupy the Property through October of 2019 with extension options held by ADH Collision that could operate to extend its rights in the Property through October of 2029. In its relentless pursuit to buy up as much of the property in the areas surrounding its resort casino as possible, Wynn has knowingly sought to end the ADH Collision Lease agreement through improper means for its sole benefit.

From approximately October of 2015 to June of 2016, Wynn forwarded a series of increasingly lucrative, written offers to buy the Property[1] to the Landlord. The offers always included the same significant condition, which stated:

**8. Tenancy:**

Seller shall deliver the Premises free and clear of all tenants and unencumbered by any existing or future lease commitments.

Each of Wynn's offers was for a larger purchase price than the offer that preceded it, starting at an initial figure of $4.9 million in October of 2015 to a final offer of $9.75 million in June of 2016. Critically, throughout Wynn's negotiations with the Landlord, Wynn remained steadfast that the Property be sold free of tenants—a condition Wynn knew required a termination of ADH Collision's Lease to the Property.

While the Landlord and Wynn seem to have agreed to a purchase price in June of 2016, Wynn insisted the agreed $9.75 million figure would only be paid on the previously-stated condition demanding the Property be conveyed free and clear of tenants, and by the summer of 2016, it became clear that the Landlord and Wynn had what Wynn termed a "tenant issue" with ADH Collision. Lease buyout negotiations between ADH Collision and the Landlord had stalled before they truly began. In its position as an experienced international property developer, Wynn guided the Landlord—a local small business owner—in its negotiations with ADH Collision. First, Wynn directed the Landlord to ask ADH Collision for a monetary amount it would accept to relinquish its rights under the Lease and relocate its auto body shop operation to other premises.  Next, after receiving ADH Collision's initial monetary proposal for its relocation, Wynn and the Landlord deemed the figure to be "too much" and resolved that the Landlord

---

[1] Wynn's offers were for purchase of a collection of properties owned by the Landlord and its affiliates, which included the Property at 36 Mystic Street. For the purposes of this Complaint, the Plaintiff will simply refer to "the Property" as the subject of the offers, though there were other properties included in Wynn's offers.

would not make a counteroffer. Instead, Wynn advised the Landlord to "find [ADH Collision] in default" of the Lease rather than engage in good faith negotiations to pay for the relocation of the Plaintiff's business. From August of 2016 to the present, in accordance with the Landlord's discussions with Wynn, the Landlord has engaged in an onslaught of unsuccessful, bad faith attempts to wrongfully manufacture circumstances which would allow the Landlord to find ADH Collision in default under the Lease, terminate the Lease, and thus be able to convey the Property to Wynn "free and clear of all tenants and unencumbered by any existing or future lease commitments" as required by Wynn.

Importantly, up until ADH Collision submitted a suggested relocation cost to the Landlord, ADH Collision and the Landlord enjoyed an excellent relationship without incident for nearly two years.[2] By all accounts and pursuant to the ADH Collision Lease extension options, ADH Collision and the Landlord foresaw their business relationship to be mutually beneficial for many years into the future. Difficulties between ADH Collision and the Landlord ensued for the first time only upon Wynn's involvement in the relocation discussion between the Plaintiff and its Landlord. Starting in August of 2016, there was a sudden spate of unsubstantiated allegations of building violations made by the Landlord—violations that had not been previously identified, reported to ADH Collision, or documented in past City inspections of the Property. Further, the Landlord falsely claimed that he was unable to maintain property insurance due to ADH Collision's allegedly shoddy maintenance of and/or unpermitted construction at the Property,[3] when in actuality the Property was fully and properly insured. The Landlord consistently withheld information from ADH Collision concerning these alleged violations so as to impede the prompt cure of any Landlord-manufactured breaches—one example of which being the

---

[2] The initial Lease term began on November 1, 2014.
[3] Allegations of which curiously only arose after Wynn's discussion with the Landlord to "find [ADH Collision] in default."

3

Landlord's refusal to provide a signature needed by ADH Collision on an application for a previously unnecessary building permit. Without Wynn's inducement of the Landlord's now-perpetual, blatantly nefarious activity in the summer of 2016, there was and is no reason to suspect that ADH Collision and its Landlord would not be enjoying a continuation of its previously positive relationship through the present.

Wynn's offers to the Landlord, its direction to the Landlord to refuse engagement in good faith relocation negotiations with the Plaintiff, and the emphatically repeated and insistent terms by Wynn requiring an end to the ADH Collision Lease served to induce, direct, and condone the Landlord's maneuvers with respect to the Lease. Wynn's actions were taken for its sole benefit and knowingly without regard for ADH Collision's valid contractual rights under the Lease. ADH Collision has been and continues to be irreparably harmed by the Landlord's incessant harassment, which only began and only continues as a direct result of Wynn's untoward imposition upon ADH Collision's relationship with its Landlord.

## PARTIES

1. The Plaintiff, ADH Collision of Boston, Inc. ("ADH Collision"), is a Massachusetts corporation with its usual place of business in Everett, Middlesex County, Massachusetts.

2. Defendant, Wynn Resorts, Limited is a publicly traded Nevada corporation with a principal place of business located at 3131 Las Vegas Boulevard South, Las Vegas, Nevada 89109. Wynn Resorts, Limited is the sole owner/member of Wynn MA, LLC.

3. Defendant, Wynn MA, LLC, is a limited liability company organized under the Laws of the State of Nevada with a principal place of business located at 3131 Las Vegas

Boulevard South, Las Vegas, Nevada 89109. Wynn MA, LLC is wholly owned by its sole member, Wynn Resorts, Limited, a publicly traded Nevada corporation.

4. Defendant, Wynn Design & Development, LLC, is a limited liability company organized under the Laws of the State of Nevada with a principal place of business located at 3131 Las Vegas Boulevard South, Las Vegas, Nevada 89109. Wynn Design & Development, LLC is wholly owned by its sole member, Wynn Resorts, Limited, a publicly traded Nevada corporation.

## JURISDICTION AND VENUE

5. This Court has jurisdiction in this matter under 28 U.S.C. §1332 as there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

6. Venue is appropriate in this Court because, pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2), Wynn, which is registered to conduct business in Massachusetts, is deemed to "reside" in Massachusetts.

## FACTS COMMON TO ALL COUNTS

7. On or about October 28, 2015, Burgess Properties, acting as a disclosed agent of Wynn, delivered an Offer to Purchase a collection of properties owned by the Landlord (and affiliates), including the Property leased by ADH Collision, for $4.9 Million.

8. The October 28, 2015 Offer to Purchase included the Paragraph 8: Tenancy, which stated in definite terms:

> Seller shall deliver the Premises free and clear of all tenants and unencumbered by any exiting or future lease commitments.

9. The Landlord rejected the October 28, 2015 Offer. Subsequently, from October 2015 to March 2016, Wynn continued discussions with the Landlord for the purchase of the Property.

10. Wynn knew about the ADH Collision Lease and its terms in approximately October of 2015 due to preliminary discussions with the Landlord leading up to Wynn's first offer.

11. On March 1, 2016, Wynn submitted a second written Offer to Purchase with an increase in the purchase price to $7 million. The second Offer to Purchase once again included the condition that the properties be "free and clear of all tenants."

12. On March 7, 2016—only six days after the second offer—Wynn submitted a third Offer to Purchase on the same exact terms, including the tenant-free condition, and increased the offered purchase price to $8 million.

13. At the time of the third offer, Wynn executive, Christopher Gordon, believed the $8 million figure would be close to or at a purchase price acceptable to the Landlord.

14. The Landlord rejected Wynn's offer of $8 Million for the Property.

15. On or about May 26, 2016, Wynn requested a counteroffer from the Landlord after having informally raised its offer to $8.25 million in the months of talks between March 7, 2016 and May 26, 2016.

16. On or about June 2, 2016, the Landlord counteroffered with a purchase price demand of $9.75 million.

17. On or about June 8, 2016, Wynn accepted the Landlord's counteroffer, subject to all the conditions in the previous written Offers to Purchase, including Paragraph 8 requiring that there be no tenants on the subject properties.

18. Once Wynn notified the Landlord of its acceptance, Wynn and the Landlord jointly moved to resolve the "tenant issue."

19. From June 8, 2016 to July 19, 2016, Wynn held multiple discussions with the Landlord concerning the ADH Collision Lease.

20. On or about June 24, 2016, Wynn became aware that ADH Collision requested a payment of at least $2.2 million to effect a relocation of its business to other premises.

21. Wynn and the Landlord determined that ADH Collision's request, made under no obligation to relinquish its Lease rights in the Property through at least October of 2029, was "too much."

22. Sometime between June 24, 2016 and July 19, 2016, the Landlord provided a copy of the ADH Collision Lease to Wynn, which Wynn analyzed in preparation for a meeting with the Landlord concerning the Lease.

23. On or about July 15, 2016, Mr. Gordon of Wynn made the written notation that he "worked on tenant issue."

24. Four days after the July 15, 2016 notation, on or about July 19, 2016, Wynn's Mr. Gordon met with the trustee of the Landlord, Mr. Vigorito, Mr. Vigorito's son and Mr. Vigorito's business partner where the four men discussed "trying to find [owner and operator of ADH Collision], Adam [Haddad] in default" on the ADH Collision Lease.

25. Wynn knew that ADH Collision had no obligation to relinquish its contractual rights under the ADH Collision Lease and relocate until at least the year 2029.

26. Rather than offer to pay ADH Collision any amount to relocate, Wynn induced and condoned the Landlord's effort to "find [ADH Collision] in default" under the Lease as the means to reach its goal of purchasing the Property free of tenants.

27. Accordingly, Wynn's Mr. Gordon ended the July 19, 2016 meeting with a reminder to Mr. Vigorito that Wynn had "met his [$9.75 million] offer based on tenant free."

28. With Wynn's conditional acceptance of the $9.75 million purchase price demand on the table, the Landlord initiated an unlawful campaign in August of 2016 to find ADH Collision in default of its Lease, just as the Landlord had discussed with Wynn's Mr. Gordon on July 19, 2016.

29. Just three days after Wynn's Mr. Gordon noted that ADH Collision's tenancy was a "major problem" for Wynn, the City of Everett Building Department (the "Building Department") received a letter from Mr. Vigorito acting on behalf of the Landlord.

30. In the letter to the Building Department, Mr. Vigorito called for a baseless investigation of the Property.

31. Within days of the Building Department's receipt of Vigorito's letter, the Building, Electrical, Fire, and Plumbing Inspectors from the City of Everett visited ADH Collision despite the Property having been inspected earlier in 2016 and found to be in full compliance with all laws and regulations.

32. On August 16, 2016, the Landlord received a Notice of Violations with respect to the Property from the Building Department.

33. The Landlord did not share the Notice with ADH Collision or inform ADH Collision of its existence. Instead, on August 19, 2016, the Landlord, through its counsel, sent ADH Collision a letter alleging several technical and procedural breaches of the Lease.

34. Upon receipt of the August 19, 2016 letter, ADH Collision sought to cure any and all of the manufactured breaches (as permitted by the Lease), including applications for the appropriate, previously unneeded permits for alleged alterations to the building on the Property.

35. Mr. Vigorito's signature as trustee of the Landlord was required for one or more of the aforementioned applications, and Mr. Vigorito unreasonably refused to cooperate with ADH Collision's requests for his signatures in an attempt to obtain the cost-free Lease termination desired by the Landlord and Wynn.

36. ADH Collision commenced legal action on October 7, 2016 seeking declaratory relief that the ADH Collision Lease remains valid. That litigation is ongoing.

37. The Landlord continues to harass ADH Collision in order to collect the premium price of $9.75 million that Wynn offered for the Property, without accounting for ADH Collison's long-term Lease.

38. On or about September 11, 2018, ADH Collision sent a letter to Wynn pursuant to Massachusetts General Laws Chapter 93A regarding Wynn's unfair or deceptive trade practices in its role in the direct inducement of the Landlord's unlawful attempts to deprive ADH Collision of its valid rights under the Lease.

39. On or about October 1, 2018, Wynn responded to ADH Collision's letter with an outright denial of liability and failed entirely to make any settlement offer in light of its unfair or deceptive conduct with respect to ADH Collision and its Lease.

## COUNT I
### (Intentional Interference with Advantageous Business and Contractual Relations)

40. ADH Collision repeats and realleges all of the facts and allegations of Paragraphs 1 through 39 above as if set forth fully herein.

41. ADH Collision has a valid, enforceable lease contract (the "Lease") with the Landlord which began on November 1, 2014 and will continue in effect through at least October of 2029.

42. Wynn knew of the existence of the Lease starting in October of 2015.

43. Wynn conditioned the purchase of the Property on the Landlord's ability to convey the property "free and clear of tenants."

44. Wynn consistently increased the value of its offer to purchase the Property, always insisting upon the aforementioned tenant-free condition.

45. The repeatedly increased offers increasingly incentivized the Landlord to find a way to terminate the ADH Collision Lease.

46. Wynn discussed and condoned the Landlord's campaign to find ADH Collision in default under the Lease, which was conceptualized at the July 19, 2016 meeting between Wynn and the Landlord.

47. ADH Collision has suffered irreparable harm due to the loss of a previously thriving business relationship with its Landlord which has devolved into a contentious, litigious battle that has caused ADH Collision to suffer monetary damages by way of the Landlord's many actions to effect a cost-free termination of the Lease taken under the inducement of Wynn's decision to incentivize such conduct and participate in the conceptualization of such conduct.

WHEREFORE, ADH Collision requests that this Court enter judgment in its favor against the Defendants, Wynn, on Count I for intentional interference with advantageous contractual relations with its Landlord and award ADH Collision damages in the amount of $3,200,000 plus attorneys' fees, interest at the statutory 12% per annum from and after October 25, 2015 and costs.

## COUNT II
### (Violations of Massachusetts General Laws Chapter 93A)

48. ADH Collision repeats and realleges all of the facts and allegations of Paragraph 1 through 47 above as if set forth fully herein.

49. Wynn is engaged in business in the Commonwealth of Massachusetts and is registered to do business in the Commonwealth of Massachusetts.

50. By the facts and conduct set forth herein above, Wynn engaged in unfair or deceptive trade acts or practices by covertly inducing the Landlord's attempts to find ADH Collision in default under the ADH Collision Lease, so that the Lease could be terminated for the benefit of Wynn long before its stated lease term expiration.

51. Prior to Wynn's pursuit of the Property, the Landlord and ADH Collision enjoyed an excellent working relationship without incident since October 24, 2014 when they started their business relations.

52. After nearly twenty (20) months without issue, ADH Collision's relationship with the Landlord deteriorated only because of Wynn's inciting conduct and involvement with respect to the Property.

53. Wynn has consistently and increasingly incentivized the wrongful behavior of the Landlord with full knowledge from the outset of the illegality of the joint scheme, having been conceptualized at the July 19, 2016 meeting with a Wynn executive, Mr. Christopher Gordon.

54. Wynn's actions fall squarely within the prohibited conduct described in Massachusetts General Laws Chapter 93A.

55. Wynn's unfair or deceptive trade acts or practices occurred within the Commonwealth of Massachusetts, and include intentionally interfering with ADH Collision's advantageous business and contractual relation with the Landlord through improper means and for its sole advantage.

56. Wynn's wrongful actions described herein were willful and knowing.

57. As a direct and proximate result of Wynn's willful and knowing unfair acts or practices, ADH Collision has suffered and will continue to suffer significant harm in the form of loss of advantageous business and contractual relations, including but not limited to all losses associated with its existing ADH Collision Lease and with the Landlord.

WHEREFORE, ADH Collision requests that this Court enter judgment in its favor against the Defendants, Wynn, on Count II for violation of M.G.L. c. 93A and award ADH Collision triple damages in the amount of $9,600,000 plus attorneys' fees, interest at the statutory 12% per annum from and after October 25, 2015 and costs.

**PLAINTIFF CLAIMS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

ADH COLLISION OF BOSTON, INC., Plaintiff

By its attorneys,

/s/ Stephen F. Gordon
Stephen F. Gordon (BBO No. 203600)
Todd B. Gordon (BBO No. 652482)
Robert A. DiSorbo (BBO No. 699357)
The Gordon Law Firm LLP
River Place
57 River Street
57 River Street
Wellesley, MA 02481
Tel: (617) 261-0100
Fax: (617) 261-0789
Email: sgordon@gordonfirm.com
tgordon@gordonfirm.com
rdisorbo@gordonfirm.com

Dated: February 7, 2019

P:\Clients-GLF\ADH (Accurate) Collision\Wynn\Plead\Complaint(Final).docx